## Spencer v. Commonwealth.

(Decided February 6, 1931.)

C. A. NOBLE and W. C. EVERSOLE for appellant.

J. W. CAMMACK, Attorney General, and SAMUEL B. KIRBY, JR., Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

A. C. Spencer, Omar Jennings, Wesley Thomas, and Jim Vires were jointly indicted for the willful murder of Clayton Manious, and, on his separate trial, appellant, A. C. Spencer, was convicted, and his punishment fixed at confinement in the penitentiary for life.

The indictment charged a conspiracy, and, in separate counts, accused each of the defendants as principals and the others as aiders and abettors.

Spencer and Thomas were residents of Breathitt county, and Jennings and Vires resided in or near Hazard in Perry county. A few days before Manious was killed, Spencer and Thomas went to Hazard, as they say in search of work, and while there spent considerable time at Vires' home. The Louisville & Nashville Railroad tracks are located across the Kentucky river from Hazard, and about one mile north of Hazard is a railroad tunnel 1,700 feet in length. Between the railroad station and the tunnel are the Hazard yards. The tipple of the Daniel Boone Coal Company is located about 300 feet north of the north end of the tunnel, and 100 feet north of this tipple is the station of Lennut. The tunnel is used by pedestrians in traveling between Hazard and Lennut.

Clayton Manious had been employed by the Daniel Boone Coal Company for a number of years and worked at the tipple. About 6 o'clock in the evening of January 9, 1930, his body was found on the railroad track in the tunnel lying between the rails. The head, which had been severed from the body, was lying about two feet from one of the rails. An examination of the body disclosed that Manious had been shot in the left breast, the bullet passing through or near his heart. One bullet had also passed through one of his arms. Two caps were found on the track about 15 feet from the body and one

of these was identified as appellant's. There were a number of footprints at the point where the body was found, and there was very little blood on the ground. The spinal column protruded from the body about three inches. The bone was not crushed, nor were the tissues bruised or mangled, which tended to indicate that the head had been severed by means of a sharp instrument and not by the wheels of a locomotive.

Two or three witnesses who were near the mouth of the tunnel heard five or six shots fired, apparently in the tunnel, about twenty minutes before the body was found. There is no evidence that any train passed through the tunnel during this interval, except that deceased's shirt and coat were slightly dirty, indicating that the body might have been run over and dragged by a passing train. No money was found on the person of the deceased, but the pockets of his trousers were turned inside out.

On the afternoon of January 8, 1930, appellant and his three codefendants were seen at the Daniel Boone mine. They claimed they went there to procure employment, and were told by the superintendent to return the next morning, which they did. They were seen on the premises of the coal company a number of times on January 9, 1930, and on two or three occasions some of them, including appellant, were seen at the tipple in conversation with the deceased. Late in the afternoon appellant and his three codefendants were seen near the south end of the tunnel. Between 5 and 6 o'clock in the afternoon the deceased was seen to enter the tunnel from the north, and a short time after he entered the tunnel five or six reports from a pistol, being fired apparently in the tunnel, were heard.

Appellant testified that, when he failed to secure employment at the Daniel Boone mine he, accompanied by Jennings, left the home of Vires with the intention of returning to his home in Breathitt county. They went to the Hazard yards where they boarded a freight train. They rode this train through the tunnel and to a point a few miles north of Hazard, where they discovered a man watching their movements whom they thought was a railroad detective. Fearing arrest, they abandoned the train and started back to the Hazard yards for the purpose of catching another train. In order to reach the Hazard yards, it was necessary for them to walk through the tunnel. After they had walked some distance in the tunnel, Jennings discovered someone behind

them. Spencer says it was dark, but that he could see the form of a man. He commanded the person behind them to stop, and, when he failed to stop, appellant became alarmed and fired his pistol, and he and Jennings then ran out of the tunnel. He returned to Hazard where he boarded a passenger train and returned to his home in Breathitt county.

As a ground for reversal, appellant first insists that the trial court erred in admitting incompetent evidence. The evidence complained of related to the appearance of the body of the deceased when it was found, and consisted principally of facts which tended to show that the head had been severed from the body by a sharp instrument. The indictment charged appellant with the murder of Manious by shooting and wounding him, and the commonwealth introduced proof that Manious died as the result of the bullet wound in his breast, and that he was dead when his head was severed from his body. The evidence as to the manner in which the head was severed was not introduced to show the manner of the murder, but to show that it was done for the purpose of concealing the crime, and for this purpose it was admissible. There was a logical connection between the facts adduced and the inference which they were designed to establish which rendered them competent.

Dr. M. E. Combs, a physician who had had considerable experience in cases of persons who had been run over by trains, testified as to the nature of the wounds found on deceased's body, and said that in his opinion deceased was not run over by a train. His testimony on this point was as follows:

"Q. Was his head severed from his body? (Defendant objects; court overrules; defendant excepts.) A. Yes, sir. (Defendant moves the court to exclude that answer; court overrules; defendant excepts.)

"Q. Describe the wound that severed the head, was it square across or horizontal? A. Square.

"Q. What else about that wound did you observe? A. Well I observed that it was a very clean cut wound. (Defendant moves to exclude that statement from the consideration of the jury; court overrules; defendant excepts.)

"Q. What condition was his shirt and clothes in? A. The clothes were in very good condition, a little blood on them, with the exception of one of the

shoulders of the coat, looked like it had been damaged.

"Q. From your experience in examining wounds and as a physician could you give the jury an idea as to what made this wound that severed his head from his body? (Defendant objects; court overrules; defendant excepts.) A. I have had a good deal of experience in mangled bodies with the Louisville & Nashville Railroad Company, and I have never seen the severance of any parts of the body where the wheels run over, that made a wound anything like that."

Further along he said: "I don't believe the railroad wheel cut this man's head off." He was testifying as an expert, and the expression by him of his opinion was permissible. Under ordinary circumstances the opinion or conclusion of a witness with respect to matters in issue is not admissible, but, where he is possessed of special training, experience, or observation, in respect of the matter under investigation, he may be permitted to state his opinion, from facts observed by him, in order to assist the jury, in drawing the correct inference from the facts. Hicks' Adm'x v. Harlan Hospital, 231 Ky. 60, 21 S. W. (2d) 125; Mann's Executor v. Leyman Motor Co., 234 Ky. 639, 28 S. W. (2d) 956.

Lyda Thorpe, a witness for the commonwealth, was permitted, over the appellant's objection, to describe an occurrence at the home of Jim Vires on the morning after the killing. She occupied a room adjoining a room occupied by Vires and his wife. She testified that Mrs. Vires got up before daylight, covered the windows with sheets, and washed some clothing. The water with which the clothes were washed was poured out in the yard and appeared to be bloody. It is argued that this evidence is incompetent, because appellant was not present, and Mrs. Vires was a stranger to the indictment, and that it would have been incompetent even if the acts described had been those of his codefendant Jim Vires, since what a codefendant does or says after the termination of an alleged conspiracy is inadmissible unless a part of the res gestae or made in the accused's presence. The evidence did not relate to any act or statement of the codefendant. It related to the condition of the clothing washed in the Vires home, and the jury might infer from the facts shown that the clothes worn by Jim Vires on

the night of the killing were bloody. In the trial of one charged with a conspiracy to commit murder, it is competent to show the condition and appearance of his codefendants immediately after the murder. This does not violate the rule relied on by appellant. Neace v. Commonwealth, 233 Ky. 545, 26 S. W. (2d) 489.

It is next insisted that the court erred in refusing to permit C. A. Noble, attorney for the defendant, to argue the case before the jury. Immediately after the homicide, Jennings, Vires, and Thomas employed Mr. Noble to represent them. After the indictment was returned Jennings, Vires, and Thomas informed the court that Mr. Noble represented them, and Spencer informed the court that he had no counsel, whereupon the court appointed two attorneys to represent him. When his case was called for trial, one of the attorneys who had been appointed by the court to represent him was absent, and the court thereupon appointed Mr. W. C. Eversole. It appears that the jury was selected before an order granting appellant a separate trial was entered, and that Mr. Noble assisted in the selection of the jury. When the order was entered granting appellant a separate trial, Mr. Noble informed the court in the presence of the jury that he did not represent the defendant, Spencer. From that time until the conclusion of the testimony Mr. Eversole had charge of the defense. At the close of the evidence Mr. Noble informed the court that he had been employed the day before by the defendant and that he would make the argument to the jury, whereupon the commonwealth's attorney objected, and the court sustained his objection. The argument for the defendant was then made by Mr. Eversole.

Section 11 of our Constitution provides that in all criminal prosecutions the accused has the right to be heard by himself and counsel. Ordinarily the court should permit the attorney employed and selected by the accused to represent him at all stages of the trial. Here, however, the appellant informed the court when he was arraigned that he had no counsel, and the court appointed two attorneys to represent him. A careful inspection of the record shows that Mr. Eversole had represented appellant throughout the trial with ability, his examination and cross-examination of the witnesses evincing a thorough familiarity with the facts, and, under the circumstances, the trial court did not abuse a sound discretion in refusing to permit an attorney

employed during the last stages of the trial to make the argument before the jury. Appellant was not deprived of any constitutional right.

It is argued that no instruction on conspiracy should have been given because there was no evidence warranting it, but there is no merit in this complaint, since there was ample evidence from which the jury might infer that a conspiracy existed. It is also urged that this instruction was too broad, in that it authorized the jury to find the appellant guilty of willful murder as charged in the indictment if they believed that he killed and murdered Clayton Manious while the conspiracy existed, without specifying that the jury must believe that the killing was done by shooting as charged in the indictment. This error, if any, however, was cured by instructions 4 and 5, which clearly told the jury that they could not find the defendant guilty of murder unless they believed he killed Manious by shooting him.

It is finally urged that the trial court erred in failing to give an instruction embodying appellant's theory of the case. The court gave the customary instruction on self-defense, but it is insisted that the jury should have been instructed further that, if they believed that the appellant at the time he shot and killed the deceased believed, or had reasonable grounds to believe that he was being assaulted by the deceased for the purpose of robbery, he had a right to repel that assault and to use such force as was necessary, or appeared to him in the exercise of a reasonable judgment to be necessary, to repel the assault, even to the taking of deceased's life. No facts were presented from which the jury could possibly infer that the deceased meant to assault appellant for the purpose of robbing him, or which afforded reasonable or any grounds to the appellant to believe he was being so assaulted. When asked why he fired the shots, appellant said: "Well, I thought I was going to get killed myself is why I fired the shots." The instruction on self-defense fully presented appellant's theory of the case.

All the evidence points to a brutal murder committed for the purpose of robbery. Appellant's connection with the crime is clearly established, and a careful inspection of the record fails to disclose any error prejudicial to his substantial rights.

The judgment is affirmed.